## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DIJON R. GRISETTE,
Plaintiff

v.

CITY OF AURORA, *et al.*,
Defendants

No. 21 CV 4606

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

*Pro se* plaintiff Dijon R. Grisette alleges that the City of Aurora (the "City") and two of its police officers violated his constitutional rights when they arrested him for obstructing a peace officer without probable cause. (*See* R. 25.) Grisette now moves for sanctions due to the defendants' alleged failure to comply with his discovery requests (R. 58), and the parties each cross-move for summary judgment on Grisette's claims. (R. 55; R. 60.) For the reasons that follow, the Court denies Grisette's motion for sanctions, grants the defendants' motion for summary judgment in part and denies it in part, and denies the plaintiff's motion for summary judgment in its entirety.

## BACKGROUND[1]

The Court takes the following facts from the parties' Local Rule 56.1 submissions, the materials cited therein, and other aspects of the record in this case. *See* Plaintiff's Local Rule 56.1(A)(2) Statement of Material Facts ("Pl.'s SOF") (R. 61);

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

Defendants' Response to Plaintiffs' Local Rule 56.1(A)(2) Statement of Material Facts ("Def.'s Resp. to Pl.'s SOF") (R. 65); Defendants' Local Rule 56.1(A)(2) Statement of Uncontested Material Facts ("Def.'s SOF") (R. 57); Plaintiff's Response to Defendants' Statement of Material Facts ("Pl.'s Resp. to Def.'s SOF") (R. 66.) All facts are genuinely undisputed unless otherwise noted.

On September 3, 2019, a civilian named Bridget Wilson called the City's Police Department to report that she had lost her cell phone at the local mall. (Pl.'s Resp. to Def.'s SOF ¶ 5.) Defendant Cottrell Webster, a sergeant in the Department, was tasked with investigating the incident. (*Id.* ¶¶ 3–6.) Webster contacted Wilson, who informed him that her cellphone was transmitting its current location as a residential address located at 805 Fifth Street. (*Id.* ¶ 7.) Webster drove to the address, which, based on his twenty-two years of experience as a police officer, he believed was located in a high crime area. (*Id.* ¶ 8.) He gave Wilson instructions on where to park for her safety. (*Id.*)

Although not known to Wilson or Webster at the time, the house on Fifth Street was being rented to Plaintiff Dijon R. Grisette and his girlfriend, Jennifer Salazar. (*Id.* ¶ 7.) Immediately before Webster arrived, Grisette and a friend named Maria Alvarez were standing outside, about to smoke a cigarette. (R. 57-1 ("Grisette Dep.") at 23:18–24.) Grisette noticed Webster's police car driving down the block and went inside of the house. (*Id.* at 24:9–16.)

When Webster arrived at the Fifth Street address, he noticed an individual run inside of the residence, which he believed to be suspicious. (R. 57-2 ("Webster

Decl.") ¶ 9.) Webster does not indicate whether he believed that this individual was Grisette. (*See generally id.*) Webster exited the car and approached Alvarez, who was still standing outside of the house. (Def.'s Resp. to Pl.'s SOF ¶ 12; Pl.'s Resp. to Def.'s SOF ¶ 10.) Webster asked Alvarez if she lived at the location. (Webster Decl. ¶ 12.) Alvarez informed him that she did not and that she was visiting a friend. (*Id.*)

Grisette was still inside of the house when Webster began questioning Alvarez. After seeing Webster speaking with Alvarez through the window of his home, Grisette exited the house and approached Webster. (Def.'s Resp. to Pl.'s SOF ¶ 13.) He asked Webster if there was a problem. (R. 61 at 41–44 ("Grisette Decl.") ¶ 10.) Webster did not respond to Grisette's question, and instead asked the plaintiff if he was the owner of the home. (Grisette Dep. at 29:11–30:2.) Grisette refused to answer. (*See id.*) Webster told Grisette that he was at the location to investigate a matter and asked Grisette for his identification. (Webster Decl. ¶ 15.) Grisette refused. (*Id.*; Pl.'s Resp. to Def.'s SOF ¶ 15.)

Webster and Grisette began to argue. (Grisette Dep. at 36:16–17.) Webster states that Grisette began walking toward him and in circles around him aggressively with his hands behind his back. (Grisette Decl. ¶¶ 12–13; Webster Decl. ¶ 16.) Grisette testified that Webster told him at some point that his parents had "failed" at raising him, called Grisette a "dog," and told Grisette that he would "put his hands on" him. (Grisette Dep. at 36:16–24.) Grisette also claims that Webster ordered him

to stand on the sidewalk in front of his house and told him that he could not go back inside. (*Id.* 39:16–24.)

At some point during the confrontation, Grisette texted Salazar, who was at work, and asked her to return home. (Grisette Decl. ¶ 17.) When Salazar arrived at the Fifth Street address, Webster informed her that he was investigating the theft of Wilson's cellphone. (Webster Decl. ¶ 16.) Webster attempted to question Salazar, but Grisette loudly screamed at her not to answer and continued to argue with Webster. (*Id.* ¶ 17.) Webster eventually called for back-up, and another Department officer, Defendant Erin Hilton, arrived on the scene. (*Id.* ¶¶ 18–19.)

Sometime after Hilton's arrival, Salazar began recording Grisette and Webster's interaction on her cell phone. (R. 57-5.) The captured video recording shows Webster and Grisette arguing for approximately twenty minutes, while Hilton stands by observing. (*See generally, id.*) Webster repeatedly asks Grisette to identify himself and whether he lives at the Fifth Street address. (*Id.*) Grisette refuses to answer his questions. (*Id.*) Eventually, Grisette puts his hands behind his back and asks Webster to arrest him. (*Id.*) Webster asks, "why would you do that" and Grisette responds by gesturing offscreen and saying, "we can roll around his yard, we can let that motherfucker go . . . ." (*Id.* at 00:05:40-59.) Webster asks, "why would you threaten me, and Grisette responds, "because you're not taking me to jail." (*Id.*) Later, Grisette says, "[y]ou've been talking that slick shit and I've been baiting your ass the whole time . . . put hands on me so you can hurt someone today." (*Id.* at 00:08:30-59.) The

conclusion of the video shows Webster placing Grisette in handcuffs and taking him to the police car. (*Id.*)

Webster arrested Grisette for obstructing a peace officer under 720 ILCS 5/31-1(a). (R. 61 at 50–52.) Following a hearing, the criminal charges against Grisette were dismissed. (*Id.* at 67.) Grisette thereafter filed this action against Webster, Hilton, and the City, asserting claims for false arrest under Illinois law, illegal detention in violation of the Fourth Amendment, First Amendment discrimination, failure to intervene, race-based discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, indemnification, and 42 U.S.C. § 1983 municipal liability. (R. 25.) Following discovery, Grisette moved for sanctions, including entry of a default judgment, due to the defendants' alleged failure to respond to his discovery requests. (R. 58.) The parties cross-moved for summary judgment on all of Grisette's claims. (R. 55; R. 60.) After discovery closed, Grisette moved to reopen discovery, (R. 78), and the magistrate judge denied his motion. (R. 83.) The parties' pending motions for sanctions and summary judgment are now ripe for resolution.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that the Court shall grant summary judgment when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *accord Est. of Jones v. Child.'s Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018). A genuine dispute about a material fact exists if the "evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Tokio Marine Specialty Ins. Co. v. Altom Transp., Inc.*, 618 F. Supp. 3d 791, 795 (N.D. Ill. 2022) (quoting *Bloodworth v. Vill. of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012)).

When reviewing cross-motions for summary judgment, the Court "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018). However, "in rare circumstances when video footage clearly contradicts the nonmovant's claims, [the Court] may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018). Finally, because Grisette is a *pro se* litigant, the Court must liberally construe his pleadings to "give [him] a break when, although he stumbles on a technicality, his pleading is otherwise understandable." *Greer v. Bd. of Educ. of City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001).

## ANALYSIS

### I.    GRISETTE'S MOTION FOR SANCTIONS

The Court begins by briefly addressing Grisette's motion for sanctions. (R. 58.) Under Federal Rule of Civil Procedure 37, the Court possesses "inherent authority to sanction misconduct." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 775–76 (7th Cir. 2016). Rule 37 authorizes a range of sanctions—including entry of a default

6

judgment—as a penalty for a party's failure to comply with court-ordered discovery. *See id.* at 776. In imposing sanctions, a court should exercise restraint and apply only the power "adequate to the end proposed.*" See Spallone v. United States*, 493 U.S. 265, 280 (1990). Although the decision to award sanctions lies within the sound discretion of the trial court, "[t]hat discretion is abused [] where a default judgment is entered without a showing of willfulness, bad faith or fault on the part of the defaulted party." *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir. 1996).

The record does not demonstrate that Grisette is entitled to sanctions, much less a default judgment in his favor. As an initial matter, the Court notes that Grisette's motion does not comply with Local Rule 37.2, which requires the filing party to represent that they made an attempt to consult with the opposing party prior to filing a motion for sanctions. "[E]ven *pro se* litigants must follow rules of civil procedure," *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006), and the Court may insist upon adherence to its local rules even from a *pro se* litigant like Grisette. *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

Even if Grisette's motion were procedurally proper, however, it fails on the merits. Grisette argues in his motion that the defendants failed to provide him with a list of people who were arrested by the City for resisting or obstructing a peace officer. (R. 58 at 4–5.) But he conceded in a joint status report filed on September 30, 2022, that all discovery issues in the case had been resolved. (R. 43.) To the extent that Grisette is arguing that sanctions are warranted based on the defendants' *delay* in producing documents, he presents no evidence of prejudice. *See, e.g., Palomino v.*

*O'Leary*, No. 08 C 6490, 2010 WL 3025582, at *3 (N.D. Ill. July 29, 2010) (denying motion for sanctions where plaintiff failed to "explain[] how the [defendants'] late disclosures have led to any additional costs or delay."). And, in any event, Grisette presents no evidence of "willfulness, bad faith or fault" as required for the extraordinary sanction of a default. *Downs*, 78 F.3d at 1257. For all of the foregoing reasons, therefore, Grisette's motion for sanctions is denied.

## II. MOTIONS FOR SUMMARY JUDGMENT

The Court next considers the parties' cross-motions for summary judgment. (R. 55; R. 60.) Because each party moves for summary judgment on all counts of the second amended complaint, the Court considers the two motions together. Since Grisette's claims against the City are governed by the municipal liability doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978), which requires evidence of an "official policy" or "custom," *id.* at 695, the Court first addresses Grisette's claims against the individual defendants before analyzing his claims against the City.

### A. Claims Against the Individual Defendants

The Court begins with Grisette's claims against Webster and Hilton in their individual capacities.[2] Individual capacity claims "seek to impose individual liability upon a government officer for actions taken under color of state law." *Hafer v. Melo*,

---

[2] Grisette also brings claims against Webster and Hilton in their official capacities. (R. 25 ¶¶ 3, 4.) Because official capacity claims are treated as claims against the entity of which the officer is an agent, *see Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985), these claims are addressed below in the context of Grisette's § 1983 municipal liability claims against the City.

502 U.S. 21, 25 (1991). To prevail on these claims, the plaintiff must show that the officer "caused the deprivation of a federal right." *Id.*

### 1. False Arrest and Illegal Detention

The Court begins with Grisette's claims against Webster for false arrest under state law and illegal detention under federal law. A state law claim for false arrest requires proof that (1) the plaintiff "was restrained by the defendant;" and that (2) "the defendant acted without probable cause." *Selby v. Bd. of Trs. of Moraine Valley Cmty. Coll., Dist. No. 524*, No. 16 C 3489, 2018 WL 988091, at *10 (N.D. Ill. Feb. 20, 2018) (quoting *Boyd v. City of Chi.*, 880 N.E.2d 1033, 1044 (Ill. App. Ct. 2007)). Similarly, a plaintiff may prove illegal detention under the Fourth Amendment if "the defendant[s] caused a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and criminal proceedings terminated in [the] plaintiff's favor." *Williams v. City of Chi.*, 315 F. Supp. 3d 1060, 1071 (N.D. Ill. 2018) (citation omitted). The probable cause inquiry for false arrest and illegal detention claims is the same. *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011).

The parties do not dispute that Webster physically restrained Grisette or that the criminal proceedings eventually terminated in his favor. (Def.'s Resp. to Pl.'s SOF ¶ 24.) The only remaining issues for the Court to consider are (1) whether Grisette's arrest was supported by probable cause, and (2) whether Webster is entitled to qualified immunity. As set forth below, while there are genuine disputes of material

9

fact as to whether Webster had probable cause to arrest Grisette, Webster is shielded from liability by qualified immunity.

### a. Probable Cause

The Court first considers whether the evidence demonstrates that Webster's arrest of Grisette was supported by probable cause. The plaintiff bears the burden of establishing the absence of probable cause in a § 1983 false arrest action, and the existence of probable cause is an "absolute bar" to the plaintiff's claim. *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009). Probable cause exists "when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." *Jump v. Vill. of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022). "If the underlying facts supporting the probable cause determination are not in dispute . . . the court can decide whether probable cause exists." *Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022), *cert. denied* 143 S. Ct. 1083 (2023).

Grisette was arrested for the crime of resisting or obstructing a peace officer. *See* 720 ILCS 5/31-1(a). The statute provides:

> A person who knowingly: (1) resists arrest, or (2) obstructs the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his or her official capacity commits a Class A misdemeanor.

720 ILCS 5/31-1(a). Here, only the second element of the statute—obstruction—is at issue. Obstructive conduct is not necessarily limited to physical acts. *People v. Baskerville*, 963 N.E.2d 898, 905 (Ill. 2012). Nonetheless, the statute does not "proscribe mere argument with a policeman about the validity of an arrest

or other police action." *Id.* at 904 (quoting *People v. Raby*, 240 N.E.2d 595, 599 (Ill. 1968)).

In determining whether probable cause for obstruction exists, the Court must weigh all facts and circumstances and consider the "tendency of the conduct to interpose an obstacle that impedes or hinders the officer in the performance of his authorized duties." *Id.* at 905. The Seventh Circuit has recognized that obstruction may fall on a continuum between outright physical confrontation, which is clearly obstructive, and mere verbal argument, which is not. *See, e.g., Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (collecting cases).

When the confrontation between Webster and Grisette occurred, Webster was investigating Wilson's missing cell phone. (Webster Decl. ¶ 8); *Julian v. Paz*, No. 14 C 7163, 2017 WL 839480, at *3 (N.D. Ill. Mar. 3, 2017) (theft investigation is part of police officer's authorized duties for obstruction purposes). The relevant question, therefore, is whether Webster had probable cause to arrest Grisette for obstructing his investigation of the alleged theft; in other words, whether a reasonable officer with on-scene knowledge would have believed that Grisette's actions presented an obstacle that impeded or hindered Webster's investigation of the missing cell phone. *Jump*, 42 F.4th at 789.

Grisette argues that Webster lacked probable cause to arrest him because he was not performing any act that impeded Webster's duties when he was arrested. (R. 62 at 4–6.) He points out that he did not physically resist Webster and his resistance was purely verbal. (*Id.*) He also argues that his verbal altercation with Webster had

11

no relationship with the investigation of Wilson's missing cellphone. (*Id.* 5–6.) He implies that Webster became distracted from his investigation of the missing cell phone to engage in a "childish and heated" argument with him. (Grisette Dep. at 36:16–17.)

In response, the defendants argue that seven pieces of evidence gave rise to probable cause for obstruction, either individually or in the aggregate: (1) Wilson's report to Webster of her phone "pinging" at the Fifth Street location; (2) Webster's testimony that he saw "an individual running upstairs" when he arrived at the Fifth Street address; (3) Grisette's refusal to identify himself or comply with Webster's orders despite repeated requests, (4) Grisette's instruction to Salazar not to answer Webster's questions, (5) Grisette's threat "to release his pit bull" on Webster, (6) Grisette's attempt to trick Webster into a physical altercation, and (7) Grisette's generally aggressive behavior and use of profanity (R. 56 at 5.) The defendants also emphasize that the confrontation lasted for over forty minutes. (*See id.*) In determining whether the plaintiff has established lack of probable cause, the Court considers each of these pieces of evidence individually and in the aggregate. *Baskerville*, 963 N.E.2d at 905.

First, Wilson's report of her phone "pinging" at the Fifth Street location and Webster's testimony that he saw "an individual running upstairs" before Grisette walked out of the house do not support the defendant's argument that Webster had probable cause to arrest Grisette for obstruction. While Webster's initial observations relate to his performance of an "authorized act," *i.e.*, his investigation of Wilson's

12

missing cellphone, there is no evidence or testimony explaining how these observations are relevant to Grisette's arrest which occurred nearly forty minutes later. (*See generally* Webster Decl.) Webster does not testify, for example, that he believed that Grisette was responsible for the phone pinging to that location or that he was the individual who ran into the house. (*See id.*) And in an incident report filed after Grisette's arrest, Webster stated that he "did not want to arrest [Grisette]," because his interaction with him "was not the reason [he] originally responded" to the location. (R. 57-2 at 7.) Simply put, the observations that Webster made before Grisette arrived on the scene would not lead a reasonable observer to conclude that Grisette was impeding the investigation.

The Court next considers Grisette's failure to identify himself in response to Webster's questions. Refusing to identify oneself to a police officer is, on its own, insufficient to establish probable cause for obstruction. *People v. Fernandez*, 2011 IL App (2d) 100473, ¶ 8 ("[O]ne cannot be convicted of obstruction merely for refusing to identify oneself."); *see also id.* (collecting cases). This is so even if the individual who refuses to present his identification is "belligerent and uncooperative." *Lyberger v. Snider*, 42 F.4th 807, 812 (7th Cir. 2022).

Likewise, a long line of Illinois authority holds that the use of profanity and verbal resistance to a police officer's orders is insufficient to establish probable cause for obstruction. *See, e.g.*, *People v. Hall*, 191 N.E.3d 596, 605 (Ill. App. Ct. 2021) (reasoning that the fact that defendant was "uncooperative and argumentative" was insufficient to support probable cause for obstruction); *People v. Berardi*, 948 N.E.2d

98, 103 (Ill. App Ct. 2011) (reversing conviction for obstruction because the defendant's "refusal to leave and his statement that he would have to be arrested were based on his belief that he had a legal right to be present"); *People v. McCoy*, 881 N.E.2d 621 (Ill. App. Ct. 2008) (holding that "verbal resistance or argument alone, even the use of abusive language, is not a violation of the statute"). Consistent with this authority, Grisette's generally aggressive behavior, use of profanity, and refusal to comply with Webster's orders do not, in isolation, support a finding of probable cause.

The defendants cite *Martinez v. City of Chicago*, 900 F.3d 838 (7th Cir. 2018) and *Abrams v. Walker*, 165 F. Supp. 2d 762 (N.D. Ill. 2001), *aff'd*, 307 F.3d 650 (7th Cir. 2002), for the proposition that belligerence and failure to follow an officer's instructions may give rise to probable cause for obstruction. (R. 56 at 7.) But these cases are distinguishable. In *Martinez*, the individual charged with obstruction directly interfered with two police officers' pursuit of a fleeing suspect. 900 F.3d at 843. It was not the plaintiff's belligerence alone that supported probable cause; rather, the Seventh Circuit held that the individual's "lack of cooperation, considering the exigency underway" gave rise to probable cause. *Id.* at 847. Here, there was no exigency; Webster was not pursuing a fleeing suspect when he arrested Grisette. In fact, a reasonable jury might conclude from viewing the video footage recorded on Salazar's cellphone that, consistent with Grisette's theory, Webster had become

14

distracted from his initial task of investigating Wilson's missing cell phone to engage in a personal argument with Grisette. (*See* R. 57-5.)

*Abrams* is likewise distinguishable. There, the plaintiff backed his car in front of a police officer's car on the highway while he was conducting a traffic stop. 165 F. Supp. 2d at 765. The plaintiff proceeded to verbally harangue the officer for over twenty minutes, and the altercation concluded with the plaintiff grabbing a knife. *Id.* The district court emphasized the plaintiff's physical acts—not his verbal resistance—as the basis for finding probable cause for obstruction. *Id.* at 767. Here, there are no actions in the record comparable to backing a car in front of an officer or brandishing a knife.[3]

The defendants also point to the overall length of the encounter as evidence of probable cause. (R. 56 at 5.) They emphasize that Grisette's interaction with Webster lasted approximately forty minutes—nearly twice as long as the traffic stop in *Abrams*. (*Id.*) But in *Abrams*, the individual charged with obstruction was encouraged to leave the scene "[t]hree or four times" before he was arrested, but refused. *See generally,* 165 F. Supp. 2d at 765. Here, by contrast, Grisette testified during his deposition that he believed he was not free to leave and reenter his home during his

---

[3] The defendants also cite *Cady v. Sheahan* for the proposition that "an individual could be arrested for obstructing a peace officer for failing to identify himself during a temporary stop." 467 at 1063 n.8. The portion of the footnote in *Cady* that defendants quote, however, references an Illinois statute that allows an officer to demand an individual's name and address "when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense." 725 ILCS 5/107–14. Webster's affidavit includes no testimony indicating that he reasonably inferred that Grisette was committing, was about to commit, or had committed a crime when he stopped him for questioning. (*See generally* Webster Decl.)

confrontation with Webster. (*See* Grisette Dep. at 30:6–7, 46:12–13, 39:16–24.) The evidence does not suggest that Grisette was unilaterally responsible for prolonging the encounter.

Having concluded that Grisette's profanity, belligerence, and general failure to comply with Webster's orders did not give rise to probable cause, the Court is not convinced that the remaining evidence demonstrates as a matter of law that Webster had probable cause to arrest Grisette for obstruction.

Consider, for example, Grisette's instructions to Salazar not to answer Webster's questions. The parties agree that Salazar was not at the Fifth Street address when Webster began investigating Wilson's missing cell phone, nor does Webster identify any pertinent information he was attempting to obtain from Salazar when she arrived on the scene in response to Grisette's text message. Notwithstanding Grisette's instructions to Salazar not to answer Webster's questions, the incident report indicates that Salazar "provide[d] [Webster] with all her info." (R. 57-2 at 7.) A reasonable jury could conclude that Grisette's statements to Salazar did not obstruct the investigation.

Similarly, the parties dispute whether Grisette was threatening Webster or attempting to trick him into a physical confrontation when he made the provocative comments recorded in the video. (*See* Pl.'s Resp. to Def.'s SOF ¶¶ 28–29.) While threats made in a police officer's presence may constitute probable cause for obstruction, *see, e.g.*, *People v. Gordon*, 948 N.E.2d 282, 287–88 (Ill. App. Ct. 2011), the low quality of the uploaded video and the fact that it appears to have been filmed

at sundown make it difficult to discern the physical proximity between the two men and whether the statements in question were intended as threats. *Cf. Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1014 (7th Cir. 2006) (reversing district court's determination of probable cause based on surveillance footage because "the camera footage itself lacked a clarity of resolution that made it difficult to discern significant detail."). For instance, when Grisette says "we can let that motherfucker go" in the video while gesturing offscreen—which the defendants characterize as a threat to unleash a pit bull on Webster—there is no dog visible in the video. (R. 57-5.) The statement is ambiguous when considered on its own, and Grisette denies that it was intended as a threat. (Pl.'s Resp. to Def.'s SOF ¶ 28.) Accordingly, this evidence also does not demonstrate, as a matter of law, that Webster had probable cause to arrest Grisette for obstruction.

The parties further dispute whether Grisette was attempting to trick Webster into a physical confrontation when he stated, "I've been baiting your ass the whole time . . . put hands on me so you can hurt someone today." (*Id.* ¶ 29.) Webster claims that Grisette was attempting to instigate a fight, but Grisette testified that Webster had already threatened to "put hands on him" earlier before Salazar arrived and began filming them. (Grisette Dep. at 36:20.) While Grisette's statements were certainly inflammatory, a reasonable jury could conclude, based on the surrounding context, that they were not threats or incitements to violence and were more akin to "mere argument" with a police officer. *Raby*, 240 N.E.2d at 599. This is especially true considering that "[p]olice officers reasonably may be expected to exercise a higher

degree of restraint than the average citizen and should be less likely to be provoked into misbehavior by [profanity-laden] speech." *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003).

In sum, none of the evidence presented by the defendants, when considered individually or in the aggregate, compels the conclusion that Webster had probable cause to arrest Grisette for obstruction as a matter of law. Due to disputed issues of material fact regarding whether Grisette's conduct constituted obstruction, the Court cannot conclude as a matter of law that Webster had probable cause to arrest Grisette.

### b. Qualified Immunity

Having concluded that there are a genuine disputes of material fact as to whether Grisette's constitutional rights were violated, the Court next considers whether Webster is entitled to qualified immunity.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). In the context of false arrest claims, courts have described this standard as "arguable probable cause," because it protects officers whose unconstitutional conduct is not prohibited by clearly established law. *Baier v. Pikolcz*, No. 18 C 05603, 2021 WL 3799597, at *5 (N.D. Ill. Aug. 26, 2021) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). In the context of a false arrest or illegal detention claim, in order for an officer to be entitled to qualified immunity, the Court must conclude that "a reasonable officer

could have mistakenly believed that probable cause existed.*" Fleming v. Livingston Cnty.*, 674 F.3d 874, 880 (7th Cir. 2012).

Here, Webster is entitled to qualified immunity because a reasonable officer could conclude, based on the information that was available to him at the time, that there was probable cause to arrest Grisette for obstruction. *Id.* As explained above, both federal and state courts have recognized that obstructive conduct need not be physical in nature, and that failure to comply with a police officer's orders can, in some circumstances, give rise to probable cause for obstruction. *See, e.g.*, *Baskerville*, 963 N.E.2d at 905; *Martinez*, 900 F.3d at 847. In this case, "the simple fact that reasonable minds could differ as to the meaning of the law leads to the conclusion that [Webster] is shielded by qualified immunity." *Abbot*, 705 F. 3d at 723.

Additionally, once a defendant raises the defense of qualified immunity at summary judgment, it becomes the plaintiff's burden to identify a closely analogous case or persuade the Court that the officer's conduct was so egregious that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully. *Id.* at 723–24. Grisette has not identified a case that is closely analogous to this one in response to the defendant's motion for summary judgment, nor has he supplied evidence that Webster's conduct was beyond the pale of what a reasonable officer would consider to be lawful under the circumstances. (*See*

*generally* R. 67.) He has therefore failed to meet his burden of responding to the defense.

In sum, the Court grants summary judgment for Defendant Webster on Counts I and II of the second amended complaint based on qualified immunity.

### 2. First Amendment Discrimination

The Court next considers Grisette's claim that Webster discriminated against Grisette based on his status as a "renter" in violation of the First Amendment.[4] (R. 25 ¶¶ 40–45.) It is unclear what legal theory Grisette is attempting to assert. The defendants characterize Grisette's claim as arising under the Equal Protection Clause of the Fourteenth Amendment, which requires proof that (1) Grisette was a member of a protected class; (2) Grisette was similarly situated to individuals who were not of his protected class; (3) Grisette was treated differently than those similarly-situated individuals; and (4) the differential treatment was done with discriminatory intent. *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000). Grisette

---

[4] The second amended complaint indicates that Grisette is also asserting a First Amendment claim against the City because Webster and Hilton are City employees who were acting within the scope of their employment. (R. 25 ¶ 41.) "Municipalities cannot be held vicariously liable under § 1983 for the constitutional torts of their employees," however, and the second amended complaint contains no allegations of an official policy as related to Grisette's First Amendment allegations. *Monell*, 436 U.S. at 695; *Bohanon v. City of Indianapolis*, 46 F.4th 669, 672 (7th Cir. 2022). To the extent that Grisette is asserting a First Amendment Claim against the City, the Court grants the City summary judgment on this claim.

does not respond or otherwise challenge the defendants' characterization of his claim. (*See generally* R. 67.)

The Court agrees with the defendants that Grisette has failed to establish a Fourteenth Amendment Equal Protection claim based on his status as a renter. Being a renter is not a protected class under the Fourteenth Amendment, and Grisette presents no evidence that Webster was aware that he was renting the house at the time that he made the arrest.

It is possible that Grisette intended to assert a First Amendment retaliation claim based on a theory that Webster arrested him for exercising his First Amendment rights. *See Lund v. City of Rockford, Ill.*, 956 F.3d 938, 943 (7th Cir. 2020) (recognizing First Amendment claim based on retaliatory arrest). But if this is the case, Grisette has forfeited this theory by failing to adequately develop it. *See Celotex*, 477 U.S. at 323–24 (explaining that it is the nonmoving party's burden to present evidence to support their claim, and the failure to do so entitles the moving party to summary judgment). Grisette offers no evidence or argument that his speech was protected by the First Amendment or that his speech was a motivating factor in Webster's decision to arrest him. *See Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (describing standard for First Amendment retaliation claim); *see also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments that are "underdeveloped, conclusory, or unsupported by law" are waived at summary judgment). "Summary judgment is the 'put up or shut up' moment in a lawsuit,"

*Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010), and Grisette's failure to support his claim with adequate evidence or argumentation is fatal at this stage.

Accordingly, the Court grants the defendants' motion for summary judgment on Grisette's First Amendment claim and denies the plaintiff's motion for summary judgment on this claim.

### 3. Failure to Intervene

The Court next considers Grisette's claim that Hilton failed to intervene to prevent Grisette's civil rights from being violated. (R. 25 ¶¶ 46–50.) A failure to intervene claim under § 1983 generally consists of two elements. First, the defendant officer must have had reason to know that a citizen was unjustifiably arrested or that any constitutional violation has been committed by a law enforcement official. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Second, the officer must have had a realistic opportunity to intervene to prevent the harm from occurring. *Id.*

Here, Grisette has presented evidence that Hilton arrived on the scene and was physically present when Webster arrested him. (Def.'s Resp. to Pl.'s SOF ¶ 19.) Grisette argues that because Hilton witnessed Webster arrest him without probable cause and had the opportunity to prevent the arrest from taking place, Hilton is liable for failing to intervene to prevent his rights from being violated. (R. 62 at 7.) In response, the defendants argue that Hilton is entitled to summary judgment because no constitutional violation took place. (R. 64 at 6–7.)

As indicated above, there is a genuine issue of material fact precluding summary judgment on the question of whether or not a constitutional violation took place. And the defendants do not present any other argument in support of their

motion for summary judgment. (*See generally* R. 56.) "When a party fails to address an argument in his summary judgment brief, it is deemed a waiver." *McCready v. Title Servs. of Ill., Inc.*, No. 06 C 6280, 2008 WL 2435933, at *3 (N.D. Ill. June 16, 2008) (collecting cases). Although Hilton asserts the defense of qualified immunity in her answer, the defendants do not raise this argument in their motion for summary judgment. (*Compare* R. 17 ¶ 79, *with* R. 56.) "[I]f the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006).

Because there is a genuine issue of material fact as to whether or not Webster unlawfully detained Grisette, the defendant's only argument in support of summary judgment on this claim fails. The Court therefore denies the defendants' motion for summary judgment as to the failure to intervene count against Hilton. Because there is a genuine issue of material fact as to whether a constitutional violation took place, the Court also denies the plaintiff's motion for summary judgment on this count.

### 4. Fourteenth Amendment Racial Discrimination

The Court next considers Grisette's claim against Webster for racial profiling, harassment, and discrimination. Allegations of racial harassment in the § 1983 context are treated as claims for race-based discrimination under the Equal Protection Clause of the Fourteenth Amendment. *See Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)) ("[T]he constitutional basis for objecting to intentionally discriminatory

23

application of laws is the Equal Protection Clause."). As stated above, to establish a violation of the Equal Protection Clause, a plaintiff must show that: (1) he is a member of a protected class; (2) otherwise similarly situated to members of the unprotected class; (3) he was treated differently from members of the unprotected class; and (4) the defendants acted with discriminatory intent. *Greer*, 212 F.3d 370. Proving discriminatory intent requires "more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of . . . its adverse effects upon an identifiable group." *Chavez*, 251 F.3d at 645.

Grisette argues that Webster targeted him due to racial animus. He states that Webster was "quick to judge based on the color of Plaintiff's skin and the neighborhood he was at (*sic*)" and that he "decided to harass and discriminate" against him. (R. 62 at 9.) In response, the defendants argue that Grisette has not provided sufficient evidence of race-based discrimination. (R. 64 at 7–9.)

The Court agrees with the defendants. Even if Webster's arrest of Grisette violated the Fourth Amendment, this does not demonstrate that his actions were undertaken on the basis of Grisette's race. Grisette presents no evidence that Webster routinely declined to arrest non-Black or non-Hispanic individuals for obstruction in similar circumstances. At summary judgment, it is the plaintiff's burden to produce "evidence of similarly situated persons" treated in a disparate manner who are "*prima facie* identical in all relevant respects." *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 945 (7th Cir. 2009) (citations omitted). "[S]ummary judgment is appropriate when no

24

reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Id.* Here, because Grisette has produced no evidence that Webster treated non-Black or non-Hispanic individuals more favorably, no reasonable fact-finder could find that he has satisfied his burden of proof. *Greer*, 212 F.3d 370.

Grisette also fails to present evidence that Webster acted with discriminatory intent in arresting him. Grisette attaches eight complaints in which Black or Hispanic individuals were arrested by the Department for obstructing a police officer in support of his motion for summary judgment. (R. 61 at 107–114.) But Webster is not listed as the complainant on any of the charging documents. (*See id.*) Webster does not make any statements related to Grisette's race in the video recorded by Salazar, and Grisette did not testify in his deposition that Webster made racist statements or that his actions were racially motivated. (*See generally* R. 57-5; Grisette Dep.) Similarly, although Grisette presents civilian complaints filed about Webster, none of the complaints allege that he exhibited racial bias. (R. 61 at 69–98.) Grisette states in his declaration that Wilson told him that she believed Webster was "racist and exhibiting a personal disdain for blacks." (Grisette Decl. ¶ 35.) But because this is an out of court statement offered for the truth of what it asserts, it is hearsay. *See* F.R.E. 801(c). "A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Webster*, 583 F.3d 979, 985 (7th Cir. 2009) (citations omitted).

In sum, because Grisette has failed to present evidence of intentional discrimination, the Court denies Grisette's equal protection claims against Webster

and Hilton in their personal capacity and grants summary judgment in favor of the defendants on these claims.

### B.    Claims Against the City

Having addressed Grisette's claims against Webster and Wilson in their personal capacities, the Court next considers Grisette's claims against the City.

### 1.  Indemnification

First, Grisette asserts a claim against the City for indemnification under <u>745 ILCS 10/9–102</u> based on Webster's and Hilton's alleged constitutional violations. As the City acknowledges, this claim rises and falls with Grisette's claims against Webster and Hilton in their personal capacities. (R. 64 at 11); *see Ybarra v. City of Chi.*, 946 F.3d 975, 981 (7th Cir. 2020) (holding that, under <u>745 ILCS 10/9–102</u>, "the City cannot be held vicariously liable when its individual officers are not liable.").Because Webster is entitled to qualified immunity on Grisette's false arrest and illegal detention claims, and because Grisette has failed to present evidence of First or Fourth Amendment discrimination against Webster, the Court grants summary judgment on Grisette's indemnification claim as it relates to the claims against Webster in his personal capacity. However, because the defendants have not met their burden of establishing that they are entitled to summary judgment on Grisette's claim against Hilton for failure to intervene, and because there is a factual dispute with respect to the question of whether Grisette's constitutional rights have

been violated, the Court denies both parties' motions for summary judgment as to this aspect of Grisette's indemnification claim.

## 2. § 1983 Municipal Liability

The Court next considers whether either party is entitled to summary judgment on Grisette's § 1983 municipal liability claims. A municipality is liable for constitutional violations under § 1983 if the constitutional violation was caused by: "(1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Holloway*, 43 F.4th at 770; *accord Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). Omissions—such as a failure to act or train personnel—can constitute a basis for municipal liability if the municipality has notice of the likelihood of a constitutional violation and fails to act. *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011). To prevail, the plaintiff must first establish that they suffered an underlying constitutional violation. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010). The plaintiff must also show that the municipal action was the "moving force" behind the federal-rights violation by providing evidence of "a direct causal link" between the challenged action and the violation of the plaintiff's constitutional rights. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citations omitted).

As a threshold matter, the City argues that it is entitled to summary judgment because Grisette has failed to present evidence of a constitutional violation. (R. 56 at 12.) However, as stated above in connection with Grisette's false arrest and illegal detention claims, a reasonable jury could conclude that Grisette's constitutional

27

rights were violated when he was arrested without probable cause. And although Webster is entitled to qualified immunity for an arrest based on "arguable probable cause," the City is not. *See, e.g.*, *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012) (citing *Owen v. City of Indep., Mo.*, 445 U.S. 622, 638 (1980)) ("[T]he municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983."). Accordingly, the Court denies the City's motion for summary judgment to the extent that it is based on the failure to establish a constitutional violation and focuses on whether Grisette has met his burden of establishing a policy, custom, or practice that gave rise to the alleged violation. *Holloway*, 43 F.4th at 770.

Count IV of the second amended complaint alleges at least three theories of municipal liability: first, that Grisette's allegedly unconstitutional arrest was caused by the City's "de facto policy" of failing to intervene to prevent police officers from violating the constitution; second, that Grisette's arrest was the result of racially discriminatory policies or practices that violate the Equal Protection Clause of the Fourteenth Amendment; and, third, that Grisette's arrest was caused by the City's failure to train its officers to prevent arrests without probable cause. The Court addresses each theory in turn.

### a. Failure to Intervene

First, Grisette alleges that the City had a policy or practice of failing to intervene to prevent constitutional violations from taking place. (*See* R. 25 ¶ 49.) Grisette offers no evidence to support the statement that the City had such a policy, however. (*See generally* Pl.'s SOF.) "Where a party offers a legal conclusion or statement of fact without proper evidentiary support, the Court will not consider that

statement." *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012). Accordingly, the Court grants summary judgment for the defendants on Grisette's failure to intervene claim against the City.

### b. Equal Protection/Racial Discrimination

Next, the Court addresses whether Grisette has established that his allegedly wrongful arrest was the result of a custom, policy, or practice of racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. As stated above, an Equal Protection claim requires evidence that members of an unprotected class were treated more favorably as well as evidence of discriminatory intent. *Greer*, 212 F.3d at 370.

To establish a policy or practice of racial discrimination, Grisette appeals to an arrest record that he obtained during discovery. (R. 61 at 116–160.) The record shows the names of individuals who were arrested by the City for obstructing police officers during the past five years. (*Id.*) Grisette argues that the City arrested a disproportionate number of Black and Hispanic individuals for obstruction without probable cause, and that the City's arrest records demonstrate a policy of racial discrimination. (Def.'s Resp. to Pl.'s SOF ¶ 30; R. 62 at 8–10.)

While statistics may be used to prove a policy of discrimination, "[t]he statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Chavez*, 251 F.3d at 638; *but see Evans v. Dart*, No. 18 C 6018, 2022 WL 4551951, at *4 (N.D. Ill. Sept. 29, 2022) (suggesting that the use of statistics to prove equal protection violations is

limited to specific circumstances such as the selection of jury venire, statutory violations of Title VII, and challenges to legislative redistricting).

To the extent that the arrest report may be considered to establish a pattern or practice of racially discriminatory policing, it does not support such a pattern. The list of individuals who have been arrested by the City does not specify the individuals' races, (*see* R. 61 at 116–160), and Grisette does not explain how he arrived at the conclusion that a majority of the individuals on the list are Black or Hispanic. Moreover, Grisette presents no evidence upon which a factfinder could conclude that any of the individuals were arrested without probable cause. Absent further information about the race of the individuals on the list and the circumstances of their arrests—which Grisette has failed to provide—the list does not provide evidence of racially discriminatory policing.

As noted above, Grisette also attached eight complaints to his motion in which Black or Hispanic individuals were arrested for obstructing a police officer. (R. 61 at 107–114.) But Grisette presents no evidence beyond his own say-so to suggest that these arrests were racially motivated or that non-Black or non-Hispanic individuals were treated more favorably than the arrestees. This evidence is insufficient as well.

Finally, Grisette references statements allegedly made by the City's mayor, Richard Irvin, in the wake of the death of George Floyd in 2020 as evidence of racial discrimination. (R. 62 at 9.) Grisette alleges that Irvin told the City Council during an online meeting that "[w]e have work to do here," and referenced an "epidemic of racism and injustice." (*Id.*) The statements that Irvin made at the City Council

30

meeting are hearsay, however, and may not be considered in deciding the parties' summary judgment motions. *Gunville*, 583 F.3d at 985. Even if the statements could be considered, they were made after Grisette was arrested and are too indefinite to show causation. *Dean*, 18 F.4th at 235. The Court therefore grants summary judgment for the City on Grisette's racial discrimination claim.

### c. Failure to Train

Grisette also argues that the City had a policy or practice of failing to ensure that its officers complied with the Constitution in making arrests. (R. 25 ¶¶ 67, 70.) Specifically, Grisette suggests that the City is liable for failing to train Webster in properly determining probable cause in making arrests or de-escalating civilian interactions. (Pl.'s SOF ¶¶ 27–29.)

For a local government to be liable under a failure-to-train theory, a municipality's failure to train its officers must amount to deliberate indifference to the rights of its citizens. *Connick*, 563 U.S. at 61. This "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* Ordinarily, proving deliberate indifference requires evidence of "a pattern of similar constitutional violations." *Id.* at 62. However, one violation may be sufficient if the evidence suggests that the constitutional violation was the "highly predictable consequence" of the municipality's failure to train its personnel. *Id.* at 64; *accord Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

In support of his *Monell* claim, Grisette presents evidence that between 2015 and 2020, the City received at least nine complaints about Webster's conduct, at least

31

four of which resulted in formal investigations, and two of which ended in Webster's suspension. (*See* R. 61 at 69–98.) The complaints allege that Webster used excessive force and was "verbally abusive" (*id.* at 69), "discourteous and disrespectful," (*id.* at 70), "unprofessional," (*id.* at 71–72) and "rude." (*Id.* at 73.)[5] At least one of the incident reports alleges that Webster threatened to arrest the complainant without probable cause. (*Id.* at 78.)

Grisette also presents evidence that members of the Department were aware of the high number of complaints filed against Webster. A memo dated May 27, 2019, written by Department Commander Keith Cross, states that "those of us who have been around [Officer] Webster know that his delivery can be a little unorthodox and can sometimes give the appearance of being rude (as evidenced by the amount of public relations allegations he has had over the years)." (R. 61 at 93.) In response to the incident report regarding Grisette's arrest filed a few months later, Commander Cross wrote: "Officer Webster seems to have had several 'public-relations-related' allegations against him over the past several months. Perhaps his supervisors should

---

[5] Neither party addresses whether statements made by third parties in the incident reports are inadmissible hearsay. Although evidence must be admissible at summary judgment to be considered, the Court declines to determine whether the documents are hearsay at this stage in the proceedings. First, to the extent that the documents are being used to show that the City's disregarded allegations and not that the allegations themselves are true, they are not being used for the truth of what they assert. Even if the documents are considered hearsay, incident reports might well be admissible as records of regularly conducted activities public records and reports. *See, e.g.*, *Floyd v. Nelson*, No. 00 C 1079, 2002 WL 1483896, at *2 n.6 (N.D. Ill. July 11, 2002).

look a little further into these situations to see how these occurrences can be eliminated or reduced." (*Id*. at 58.)

Grisette also attaches Webster's training report in support of his motion. (R. 61 at 104–105.) The report shows that Webster received various departmental trainings, including a training on de-escalation in 2017 and a training on communication in 2001, prior to his two suspensions and several of the complaints being filed. (*See id*.) It does not appear that Webster received any further training on communication or de-escalation after 2017. (*Id*.) None of the training that Webster received appears to be specifically focused on making probable cause determinations. (*Id*.)

Whether the City is entitled to summary judgment on this record is a close call. None of the complaints filed against Webster establish that he violated the complainants' constitutional rights. Some of the allegations appear to relate to different conduct than the conduct that is at issue here, and in a majority of cases the allegations in the complaints were not sustained. But, again, Grisette need not demonstrate more than one constitutional violation in the record in order to establish municipal liability. *Glisson*, 849 F.3d at 381. To the contrary, "[a] single memo or decision showing that the choice not to act is deliberate could [] be enough" to demonstrate a pattern of deliberate indifference. *Id*. The key question is whether the plaintiff has presented enough evidence for a reasonable jury to conclude there was

a conscious decision by the City not to take action, and this indifference resulted in a "highly predictable" constitutional violation. *See id*; *Connick*, 563 U.S. at 64.

Here, the record demonstrates that, although Webster received training on de-escalation in 2017 and communication in 2001, commanding officers in the Department were aware in 2019—only a few months before Grisette was arrested—that Webster continued to have a "high amount" of public relations-related incidents, including "several incidents" in the months preceding Grisette's arrest. (R. 61 at 93.) Webster's training report indicates that he did not receive any specialized training on communication and de-escalation during this period, despite the fact he had been suspended without pay for violating Department policies less than one month before Grisette's arrest. (*See* R. 61 at 97.) A reasonable jury could conclude that the Department knew that there was a need for further training, and that its failure to provide the necessary training constituted deliberate indifference to the risk of constitutional violations.

Because a reasonable jury could conclude that Grisette's arrest was caused by the City's failure to train Webster and/or its deliberate indifference to the multiple disciplinary complaints against him, the Court denies the defendant's motion for summary judgment as to Grisette's § 1983 municipal liability claim based on failure to train. Because the facts do not clearly establish that Grisette is entitled to liability on this claim, however, the Court also denies the plaintiff's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the plaintiff's motion for sanctions (R. 57) is denied, the defendant's motion for summary judgment (R. 55) is granted in part and denied in part, and the plaintiff's motion for summary judgment (R. 60) is denied in its entirety. Judgment is granted (1) for Defendant Cottrell Webster on Grisette's false arrest and illegal detention claims (Counts I and II); (2) for all of the defendants on Grisette's First Amendment and Fourteenth Amendment discrimination claims (Counts III and V); (3) and for the City on Grisette's failure to intervene claim (Count IV). Grisette's claims against Defendant Hilton for failure to intervene (Count IV) and against the City for indemnification (Count VI) and failure to train (Count VII) will be allowed to proceed consistent with the terms of this memorandum opinion. It is so ordered.

Date: 4/11/2024

JEREMY C. DANIEL
United States District Judge